## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

AMY HERNANDEZ, as Administrator
of the Estate of Alex Hernandez,
deceased,

      Plaintiff,

v.

                             Case No. 3:22-CV-00566-NJR

WEXFORD HEALTH SOURCES, INC.,
DR. VIPIN SHAH, DEENA SEED, AMY
FREY, AMY THURMAN, and PAMELA
WARD,

      Defendants.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court is a Motion to Bifurcate Trial and Stay Discovery on Plaintiff's *Monell* Claims filed by Defendants Wexford Health Sources, Inc. ("Wexford"), Dr. Vipin Shah, and Nurses Deena Seed, Amy Frey, Amy Thurman, and Pamela Ward (the "Individual Defendants") (Doc. 107). This motion comes on the heels of two motions to compel that Plaintiff filed against Wexford seeking written discovery and deposition testimony. (Docs. 92, 103). Defendants contend that bifurcation and a discovery stay will streamline the litigation and avoid undue prejudice to the Individual Defendants. Plaintiff argues that bifurcation will result in unnecessary delay and increased litigation costs.

### BACKGROUND

This case arises out of the tragic death of Alex Alvarez ("Alex") on August 9, 2020.

(Doc. 64 at pp. 2, 7 (Plaintiff's Second Amended Complaint)). At the time of his death, Alex was an inmate of the Illinois Department of Corrections ("IDOC") at Lawrence Correctional Center ("Lawrence"). *Id.* at p. 2. Wexford provides healthcare services in Illinois prisons pursuant to a contract with the IDOC. *Id.* at p. 2. Defendant Dr. Shah is employed by Wexford and, at all relevant times, served as a physician at Lawrence. *Id.* Defendants Deena Seed, Amy Frey, Amy Thurman, and Pamela Ward served as nurses at Lawrence during the relevant time period. *Id.* at p. 2-3.

    1.  <u>Alex's Health Condition and Death</u>

The complaint paints a harrowing picture of the final days of Alex's life. During the night of August 7, 2020, Alex began suffering from severe gastrointestinal hemorrhage and internal bleeding.[1] *Id.* After examining Alex, Nurse Seed advised him to monitor his symptoms and come back if they persisted or worsened. *Id.* Nurse Seed also spoke with Dr. Shah in the early morning of August 8, 2020; he ordered a blood test for Alex. *Id.* at 5. That afternoon, Nurse Thurman saw Alex and noted his "deterioration in comfort," but returned him to his cell. *Id.* Later that evening, the lab tests that Dr. Shah had ordered revealed that Alex had lower than normal hemoglobin levels, was bleeding internally, and needed emergency medical treatment. *Id.* Dr. Shah saw the results of the lab tests the following morning (August 9, 2020) and scheduled an appointment with

---

[1] Alex had a history of severe GI issues in the months leading up to the critical events in this case. On October 8, 2019, Alex underwent an upper gastrointestinal endoscopy at the Carle Foundation Hospital in Urbana, Illinois, which revealed Grade I esophageal varices (enlarged veins in the esophagus), Grade A esophagitis, and gastritis. (Doc. 64 at p. 3 (Plaintiff's Second Amended Complaint)). Several months later, on June 3, 2020, Alex returned to Carle Hospital, where an esophagogastroduodenoscopy (an examination of the upper gastrointestinal tract) showed large esophageal varices, several ulcers, and chronic active gastritis. *Id.* at 4.

Alex for August 11. *Id.* at 6.

At around 9:15 p.m. on August 9, 2020, Alex was found unresponsive in his cell. *Id.* Nurse Ward wheeled him to the healthcare unit for treatment. *Id.* After the nurses were unable to obtain a blood pressure reading, Nurse Ward informed Dr. Shah of Alex's deteriorating condition. *Id.* Dr. Shah instructed her to call the hospital. *Id.* As Nurse Ward was speaking with Dr. Shah, Alex fell back on his cot with white foam coming from his mouth. *Id.* at 7. Nurse Thurman began CPR, and Nurse Ward requested that an ambulance be called. *Id.* An ambulance picked Alex up and transported him to Carle Hospital in Urbana, Illinois, where he arrived at 10:28 p.m. *Id.* Alex was pronounced dead at approximately 10:37 p.m. *Id.*

### 2. Wexford's Culpability

In addition to assigning fault to the Individual Defendants, Plaintiff alleges that Alex's death was the result of systemic deficiencies in Wexford's provision of care to people in IDOC custody. *Id.* at pp. 15-22. Plaintiff relies heavily on the reports of two court-appointed experts in the case of *Lippert v. Godinez*, No. 10-cv-4603 (N.D. Ill.), to show that Wexford knew about its shortcomings in caring for Illinois's prisoners yet maintained "deliberately indifferent policies and procedures" to maximize its own profits at the expense of inmate health. *Id.* at pp. 16-18. Chief among Plaintiff's allegations is that Wexford employed physicians who were "not properly credentialed in primary care," and that Dr. Shah is one such physician who had no business caring for Alex. *Id.* at p. 18.

The *Lippert* reports contend that "the quality of physicians in the IDOC is the single

most important variable in preventable morbidity and mortality, which is substantial." *Id.* at p. 17. Thus, it was the authors' "firm opinion that the lack of primary care physicians in the IDOC health care system is resulting in preventable deaths, which shows a gross departure from normal standards of care." *Id.* at p. 18. Plaintiff's narrative also ties Dr. Shah directly to these findings by asserting that "Wexford continued to employ physicians like Defendant VIPIN SHAH, MD, who lack appropriate training in primary care and continue to harm patients." *Id.*

Plaintiff also cites the *Lippert* findings to show that Alex's death and the manner in which it occurred fit a pattern of substandard emergency care by Wexford's healthcare providers. For instance, the authors "encountered numerous examples of patients who were admitted to the infirmary with potentially or actually unstable conditions which should have been referred to a higher level of care (*i.e.*, outside hospital)." *Id.* at p. 19. These findings included 33 deaths that involved "93 episodes of care where a patient should have been referred to a hospital." *Id.*

The *Lippert* reports also fault Wexford for not holding its healthcare providers accountable for their treatment errors. "All of the Wexford death summaries that [the *Lippert* authors] were provided, were performed by physicians who were responsible for care of the patient and failed to identify any problems, even when grossly and flagrantly unacceptable care was provided." *Id.* at p. 21. And again, tying these aggregate failures to Dr. Shah and this case, Plaintiff alleges that "Wexford continues to allow employees who commit egregious violations of the standard of care like Defendant VIPIN SHAH, MD, who has been named in hundreds of lawsuits . . . to continue harming patients with

impunity." *Id.* at p. 20.

Plaintiff Amy Hernandez, Alex's sister and administrator of his estate, filed this lawsuit on March 18, 2022. (Doc. 1). Plaintiff filed the operative second amended complaint on January 18, 2023, asserting claims of deliberate indifference to Alex's serious medical needs under the Eighth Amendment via 42 U.S.C. § 1983, and under the Illinois Wrongful Death (740 ILCS 180/1, *et seq.*) and the Survival Act (755 ILCS 5/27-6). (Doc. 64). The case is currently in discovery, which brings us to Defendants' motion to bifurcate.

## LEGAL STANDARD

"For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." FED R. CIV. P. 42(b). District courts have "considerable" discretion to determine whether bifurcation is appropriate under Rule 42(b). *Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000). "[A] district judge may separate claims or issues for trial if the separation would prevent prejudice to a party or promote judicial economy." *Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 700 (7th Cir. 2007). Indeed, "[i]f one of these criteria is met, the district court may order bifurcation as long as doing so will not prejudice the non-moving party or violate the Seventh Amendment." *Id.*; FED R. CIV. P. 42(b). Federal Rule of Civil Procedure 26(d), moreover, authorizes district courts to stay discovery in appropriate circumstances, including with respect to *Monell* claims. *Bradford v. City of Chicago*, No. 16 CV 1663, 2019 WL 5208852, *2 (N.D. Ill. Oct. 16, 2019); *see also Medina v. Chicago*, 100 F. Supp. 2d 893, 894 (N.D. Ill. 2000) ("There is no question that a

district court has the discretion to sever a *Monell* claim against a municipality from claims against individual police officers and stay litigation of the *Monell* claim until the rest of the case is resolved.").

DISCUSSION

Motions to bifurcate and stay *Monell* claims have become "routine" in federal court. *Awalt v. Marketti*, No. 11 C 6142, 2012 WL 1161500, at *10 (N.D. Ill. Apr. 9, 2012). The relevant case law reveals numerous decisions in favor of and against bifurcation. *See e.g.*, *Bradford v. City of Chicago*, 16 C 1663, 2019 WL 5208852, at *4 (N.D. Ill. Oct 16, 2019) (granting bifurcation); *Adams v. City of Chicago*, No. 06 CV 4856, 2012 WL 13060050, at *4 (N.D. Ill. Nov. 2, 2012) (same); *Psarologos*, No. 19 C 7400, 2020 WL 919215, at *2 (N.D. Ill. Feb. 25, 2020) (same); *Arsberry v. Wexford Health Sources, Inc.*, No. 17 CV 50044, 2021 WL 4942039, at *4 (N.D. Ill. Oct. 22, 2021) (denying bifurcation); *Awalt*, 2012 WL 1161500, at *13 (same). These cases reveal one thing above all: bifurcation decisions in civil rights cases are inherently fact-sensitive and "dependent upon the costs and benefits of bifurcation under the unique circumstances of each case." *Id.* at *10.

A *Monell* claim against an institutional defendant like Wexford requires evidence of "systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system." *Dixon v. Cnty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (internal quotation marks omitted). A deliberate indifference claim against a prison healthcare provider, on the other hand, involves an individualized inquiry into the defendant's culpability vis-à-vis the plaintiff. *See Petties v. Carter*, 836 F.3d 722, 729-31 (7th Cir. 2016) (en banc) (examining evidentiary threshold for deliberate indifference

claims). The same is true of Plaintiff's claims against the Individual Defendants under the Wrongful Death Act and the Survival Act. *See Awalt*, 2012 WL 1161500, at *5 ("[A] claim under the Survival Act is a derivative one; it is brought by the decedent's representative but based on the injury to the decedent"); *Williams v. Manchester*, 888 N.E.2d 1, 11 (Ill. 2008) (same for claims under Wrongful Death Act). This distinction is important here because Plaintiffs' theory of liability against Wexford ties evidence of aggregate fault to the care (or lack thereof) that Alex received from the Individual Defendants. Plaintiff's reliance on the *Lippert* reports makes it abundantly clear that she intends to show how Wexford hired and retained unqualified physicians and staff, failed to treat medical emergencies with appropriate urgency, and failed to hold its healthcare providers accountable when they provided substandard care. These failures, according to Plaintiff, were systemic and not unique to Lawrence or the Individual Defendants in this lawsuit.

There is a real danger that such evidence could improperly influence the jury's consideration of the Individual Defendants' liability. A jury that hears evidence of systemic underqualification and underperformance by Wexford's healthcare providers very well might assume that such evidence impugns the integrity of the Individual Defendants and their treatment decisions *with respect to Alex*. The risk of liability by association alone is real in a case where the evidence may show widespread misconduct by and within an entity that employs the Individual Defendants. *See Veal v. Kachiroubas*, No. 12 C 8342, 2014 WL 321708, at *6 (N.D. Ill. Jan 29, 2014) (evidence of entity-wide policy, practice or custom "involving multiple improper [individual] actions poses a danger of undue prejudice to the [individual defendants] by creating the perception that

the [entity] routinely acts improperly, even if the [individual defendants] acted properly in this case"); *Tanner v. City of Waukegan*, No. 10 C 1645, 2011 WL 686867, at *9-10 (N.D. Ill. Feb. 16, 2011) ("If admitted as part of his case against the City, such evidence could prejudice the individual defendants' ability to distinguish their own actions from those of other non-party officers.").

To illustrate this point, Plaintiff cites the *Lippert* reports to support the allegation that Wexford "allow[s] employees who commit egregious violations of the standard of care like Defendant VIPIN SHAH, MD . . . to continue harming patients with impunity." If the jury credits Plaintiff's evidence of widespread "egregious violations of the standard of care," there is a real danger that it could be used to decide the ultimate question of liability in Plaintiff's deliberate indifference claims against the Individual Defendants because "blatant disregard for medical standards [by prison healthcare providers] . . . could rise to the level of deliberate indifference." *Petties*, 836 F.3d at 728. In other words, if Wexford's doctors and nurses are believed to routinely violate minimum standards of care, it is not hard for a jury to impute such failures to the Individual Defendants. Similarly, while Plaintiff allegation that Dr. Shah "has been named in hundreds of lawsuits" may be relevant to the issue of institutional fault against Wexford, it certainly has no bearing on Dr. Shah's *individual* culpability in this case. A joint trial would thus require the Individual Defendants to defend their treatment decisions vis-à-vis Alex *and* distinguish their conduct from the entity-wide evidence of misconduct against Wexford. For that reason, the Court believes that the facts and posture of this case warrant bifurcation to avoid undue prejudice to the Individual Defendants. *See Bradford*, 2019 WL

5208852, at *4 ("where the trial of the *Monell* claim will involve evidence of suicide and attempted suicide dating years prior to the incident at issue, the risk of prejudice to the Individual Defendants in a single consolidated trial is real.").

Having determined that bifurcation reduces the likelihood of prejudice to the Individual Defendants, the Court must balance that consideration against the potential prejudice that Plaintiff might experience if bifurcation is ordered. *Chlopek*, 499 F.3d at 700. Plaintiff argues that bifurcation will delay the proceedings and generate additional litigation costs for her. These concerns are certainly well-taken, particularly in the context of an individual plaintiff litigating against a major corporation like Wexford. But while Plaintiff's day in court against Wexford may be delayed by bifurcation, the Individual Defendants could have their day in court irreparably impaired if bifurcation is not ordered. On balance, a delay (while not desirable) is a more acceptable consequence of this decision than undue prejudice at trial. Moreover, while Plaintiff contends that bifurcation will require her to incur additional costs, this contention is presented in rather conclusory fashion. The Court acknowledges that two trials (if it comes to that) are more expensive than one. But bifurcation does not increase the substantive scope of discovery or the number of issues for trial. It only provides a sequence in which the various theories of liability are worked up. *See Psarologos*, 2020 WL 919215, at *2 (bifurcation in similar case makes discovery "more efficient and manageable"). And for that reason, the Court is not persuaded that the additional cost of bifurcation justifies the risk of undue prejudice that the Individual Defendants might experience if forced to litigate alongside their employer.

It should go without saying that Plaintiff retains all rights with respect to her claims against Wexford. Once the stay is lifted, Plaintiff will be free to pursue her claims against Wexford with vigor and urgency, as she has done to this point.

CONCLUSION

For these reasons, Defendants' Motion to Bifurcate Trial and Stay Discovery on Plaintiff's *Monell* Claim (Doc. 107) is **GRANTED**. Plaintiff's Motions to Compel written discovery and deposition testimony (Docs. 92, 103 respectively) are **DENIED without prejudice** until the stay is lifted.

**IT IS SO ORDERED.**

**DATED:   September 30, 2024**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**