## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

AMY HERNANDEZ as Administrator of
the Estate of Alex Avarez, deceased,

      Plaintiff,

v.

WEXFORD HEALTH SOURCES, INC.,
VIPIN SHAH, DEENA SEED, AMY
FREY, AMY THURMAN, and PAMELA
WARD,

      Defendants.

Case No. 3:22-CV-00566-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This case arises out of the tragic death of Alex Alvarez ("Alex"), an inmate at the Lawrence Correctional Center ("LCC") within the Illinois Department of Corrections ("IDOC"). Amy Hernandez ("Hernandez"), Alex's sister and administrator of his estate, brings this action against Wexford Health Sources, Inc. ("Wexford"), Dr. Vipin Shah, and Nurses Deena Seed, Amy Frey, Amy Thurman, and Pamela Ward, whom she claims were responsible for Alex's medical care at LCC. Hernandez advances five claims under the Eighth Amendment by way of 42 U.S.C. § 1983 against Dr. Shah and Nurses Seed, Frey, Thurman, and Ward (collectively the "Individual Defendants") (Counts I through V respectively), an Eighth Amendment claim against Wexford (Count VI), five claims of medical malpractice under the Illinois Wrongful Death Act, 740 ILCS 180/2.1, against each Individual Defendant (Counts VII, IX, XI, XIII, and XV), five claims of medical

malpractice under the Illinois Survival Act, 755 ILCS 5/27-6, against each Individual Defendant (Counts VIII, X, XII, XIV, and XVI), and two claims of medical malpractice under the Wrongful Death and Survival Acts against Wexford (Counts XVII and XVIII).

On September 30, 2024, the Court bifurcated Hernandez's claims against Wexford, so that her claims against the Individual Defendants could proceed first. (Doc. 116). After the close of discovery, the Individual Defendants filed a motion for summary judgment as to all claims against them. (Doc. 141). Hernandez filed a response in opposition (Doc. 148), and the Individual Defendants submitted a reply (Doc. 158). The motion for summary judgment is thus fully briefed and ripe for disposition.

## BACKGROUND

At summary judgment, the Court views the evidence in the light most favorable to Hernandez, resolving evidentiary conflicts and drawing all reasonable inferences in her favor. *Berry v. Peterman*, 604 F.3d 435, 438 (7th Cir. 2010).

Before his death, Alex had a lengthy history of rectal bleeding, esophageal varices (enlarged veins in the esophagus), ulcers, internal discomfort, and other painful symptoms. This case is about Alex's struggles with these conditions while he was in IDOC custody. The Individual Defendants worked for Wexford, which provided healthcare services at jails and prisons in Illinois during the relevant period.

1. Alex's early Symptoms and Treatment in IDOC Custody

On January 11, 2019, while Alex was detained at the Peoria County Jail, he was seen by a nurse for blood in his stool. (Defendants' Statement of Material Facts ("Def. SOF") ¶ 7 (Doc. 141)). The staff gave him warm compresses for hemorrhoidal

discomfort, dietary instructions, and Preparation H ointment to treat his symptoms. (*Id.*).

On October 8, 2019, after he had been transferred to LCC, Alex underwent a gastrointestinal ("GI") endoscopy at Carle Hospital. (*Id.* ¶ 8). This procedure revealed Grade 1 esophageal varices, Grade A esophagitis, gastritis, and "[f]ew previously scarred varices." (*Id.*; Plaintiff's Response to Defendants' SOF ("Pl. Resp.") ¶ 8 (Doc. 148)).

On March 4, 2020, Alex was seen in the healthcare unit at LCC because he once again had blood in his stool. (Def. SOF ¶ 11; Pl. Resp. ¶ 11). A nurse filled out a pre-printed protocol sheet to address complaints of hemorrhoids. (*Id.* ¶ 11; Def. SOF ¶ 11). It was the nurse's decision to select this protocol sheet because there was no similar sheet for internal bleeding, which would have been more appropriate in light of Alex's reported symptoms. (Pl. Resp. ¶ 11). The completed protocol sheet, however, indicates that Alex *denied* a history of hemorrhoids. (*Id.*).

On June 3, 2020, Alex presented to the healthcare unit with complaints of abdominal pain, dark tarry stool x 2, and overall signs of "acute, severe discomfort." (*Id.* ¶ 12; Def. SOF ¶ 12). He was transferred to the emergency room at Carle Hospital for further treatment that same day. (*Id.* ¶¶ 12, 13). In the emergency room, an examination revealed "large varices and then a small ulcer overlying 1 of the varices that could have been the source of the bleeding." (Def. Ex. D (Doc. 141-4, p. 33)). The following day, Alex was discharged from Carle Hospital. (Def. SOF ¶ 14). His discharge instructions contained no recommendation for variceal ligation or surveillance endoscopies. (*Id.* ¶ 15).

On July 28, 2020, Alex saw Dr. Shah because he was experiencing chest pain and trouble breathing. (Pl. SOF ¶¶ 7, 30 (Doc. 148)). Dr. Shah reviewed Alex's chart and saw

that he had been hospitalized twice for esophageal varices. (*Id.* ¶ 32). Dr. Shah was concerned that Alex might have a serious heart condition, so he ordered an EKG (electrocardiogram) and a PT/INR blood test. (*Id.* ¶ 33). The results of the EKG were abnormal, which led Dr. Shah to suspect a "heart issue," potentially including heart attack, ventricular fibrillation, atrial fibrillation, and tachycardia. (*Id.* ¶¶ 34, 35). Dr. Shah saw Alex again a week later to discuss his test results, and he re-reviewed Alex's chart, showing a history of esophageal varices. (*Id.* ¶¶ 38, 39).

   2.  The Events of August 8 and 9, 2020

   In the early morning hours of August 8, 2020, Alex complained of stomach pain and lightheadedness. (Def. Ex. E (Doc. 141-5, p. 134)). At around 6:05 a.m., Alex saw Nurse Seed because he was again experiencing bright red rectal bleeding. (Pl. SOF ¶ 17). Alex was "argumentative" and complained of shortness of breath, lightheadedness, stomach pain, and nausea, among other symptoms. (Def. Ex. D (Doc. 141-4, p. 5)). Nurse Seed reviewed Alex's chart and saw that he had been hospitalized for a GI ulcer, which she understood to be a "serious medical issue" that can cause fatal internal bleeding if not treated properly. (Pl. SOF ¶ 47). Nurse Seed completed the pre-printed hemorrhoid treatment form, where she noted that Alex had no visual hemorrhoids. (Def. Ex. D (Doc. 141-4, p. 4)).

   At approximately 6:20 a.m., Nurse Seed spoke with Dr. Shah and the two discussed Alex's medical history, including hepatitis C, cirrhosis, and his hospitalization for a GI ulcer. (Def. SOF ¶ 18; Pl. SOF ¶ 53). During this conversation, Dr. Shah and Nurse Seed became concerned that Alex might be suffering from "a condition more serious than

hemorrhoids." (*Id.* ¶ 54). Dr. Shah ordered a CBC blood test to identify or rule out GI bleeding and placed Alex in the infirmary for observation. (*Id.* ¶ 57; Def. SOF ¶ 18).

At around 7:30 a.m., Nurse Seed transferred Alex's care to Nurse Frey, along with her report observations over the past hour plus. (Pl. SOF ¶ 58; Def. SOF ¶ 19). Nurse Frey found that Alex's lungs were clear, his skin dry, and his heartrate was normal. (*Id.*). Nurse Frey did not document any of the symptoms that Nurse Seed had recorded earlier that morning, although she admitted that they, in combination with rectal bleeding, could have been a sign of a fatal upper GI bleed. (Pl. SOF ¶¶ 60-61; Def. Resp. ¶¶ 60-61).

Hernandez contests Nurse Frey's finding that Alex's condition had improved. Alex's bloodwork from the CBC test revealed hemoglobin and hematocrit levels below the levels he had recorded during his visit to the hospital on June 3, 2020, where he was suffering from "acute, severe discomfort." (Pl. Resp. ¶ 19; Pl. SOF ¶ 65). Alex's hemoglobin level was 9.8, an unusually low level for someone dealing with hemorrhoids and nothing else. (Pl. SOF ¶67). Moreover, later that day, at 4:30 p.m., Alex spoke to Hernandez on the phone where he reported that he had been "sweating and sweating," was feeling "very cold, [and] very weak," and that that he was unable to walk or breathe normally, and that he had been experiencing chest pain. (Pl. Resp. ¶ 19).

At around 3:15 p.m., Alex saw Nurse Thurman. (Def. SOF ¶ 20). Although Alex's vitals were within normal limits, he was wearing adult diapers and told her that his rectal bleeding may be due to "varices or [an] ulcer." (Def. Ex. D (Doc. 141-4, p. 10)). At approximately 4:20 p.m., Nurse Thurman noted that Alex had "some red to toilet" after viewing his stool. (*Id.*). She suspected Alex may be suffering a GI bleed or internal

hemorrhoids, although she knew he had a history of esophageal varices. (*Id.*;
Pl. SOF ¶ 70).

Alex did not agree with Nurse Thurman's assessment. He explained to Hernandez
during the aforementioned phone call: "I'm losing a lot of blood. I'm sh****ng like a lot
of blood . . . I told the woman, she said when the blood comes out like that it's a, it's
hemorrhoids. I told her been having this s**t for like twenty years. I told her, I know, I
know what it is, I got some [varices] bust." (Pl. Resp. ¶ 20). Nurse Thurman recognized
that when a patient is suspected of having a GI bleed, a CBC test should be run as soon
as possible because it would reveal dropping hemoglobin levels which suggest internal
bleeding. (Pl. SOF ¶ 73). Nurse Thurman also acknowledged that a patient who is
suffering a GI bleed may need to be "sent out" to a hospital if he is also complaining
about lightheadedness. (*Id.* ¶ 74). But she insists that she did not witness lightheadedness
in Alex even though Nurse Seed had documented this symptom in her treatment note
that morning. (*Id.* ¶ 88; Def. Resp. ¶ 87).

Nurse Thurman saw Alex again at 11:15 p.m. after Alex had passed a "small"
amount of blood and told her he was feeling "much better." (Def. Ex. D (Doc. 141-4, p. 8)).
Hernandez disputes Nurse Thurman's characterization of Alex having only passed a
"small" amount of blood because Nurse Thurman thought it necessary to give Alex fresh
diapers and because Alex's autopsy later revealed two liters of blood in his GI tract—
a significant amount. (Pl. Resp. ¶ 21).

On August 9, 2020, at approximately 10:15 a.m., Alex saw Nurse Lackey, LCC's
director of nursing (not a defendant in this case). (Def. SOF ¶ 25). Alex told Nurse Lackey:

"I feel much better. No bloody stools." (*Id.*). Hernandez disputes Nurse Lackey's claim that Alex was doing "better" based on the events the day before, including his bloodwork showing low hemoglobin and hematocrit levels, his conversation with her where he expressed the urgency of his blood loss during bowel movements, and his shortness of breath, lightheadedness, stomach pain, and nausea. (Pl. Resp. ¶ 25). Nurse Lackey nevertheless reported her observations to Dr. Shah, who then discharged Alex to his housing unit sometime before lunch. (Pl. SOF ¶¶ 96-99). Dr. Shah did not order another CBC blood test before discharging Alex although he later admitted that "that would have been a good idea." (*Id.* ¶¶ 101-02).

At around 5:30 p.m. on August 9, 2020, Alex met with Nurse Ward. (Def. SOF ¶ 26). Alex asked to see a doctor because he was not feeling well. (*Id.*). Nurse Ward gave Alex an "e-pass"—short for "emergency pass"—so that he could be seen the following day. (Pl. Resp. ¶ 26). The e-pass allowed Alex to skip the line to see Dr. Shah as soon as he was back at LCC because inmates ordinarily had to wait a few days to be seen by a doctor. (*Id.*). Alex agreed to be seen the following day because no doctor was available on August 9 (a Sunday), and "he wanted to see a doctor, not talk to a doctor on the phone." (Def. Ex. I (Doc. 141-9, p. 86)).

At 9:15 p.m. on August 9, 2020, Nurse Ward responded to a "Code 3" emergency call in Alex's cell. (Pl. SOF ¶ 107; Def. SOF ¶ 27). Nurse Ward saw "bright, red fluid" in the toilet of Alex's cell and "dried red fluid on his hands, feet, and legs." (*Id.*). Nurse Ward later admitted that this unknown fluid was "blood in the toilet" and "dried blood on [Alex]." (Pl. Resp. ¶ 27). An image of Alex's cell shows a significant amount of blood in

and around the toilet and a person's clothes covered in blood. (Pl. SOF ¶ 111). Nurse Ward did not consider calling an ambulance at this time, however, because Alex was still alert and able to communicate verbally. (*Id.* ¶ 113; Pl. Resp. ¶ 27).

Alex arrived in the first aid room between 9:18 p.m. and 9:25 p.m.[1] (Def. SOF ¶ 28; Pl. Resp. ¶ 28). Nurse Ward was unable to give Alex an IV fluid or get a blood pressure reading because Alex could not hold still. (*Id.*). Nurse Ward called Dr. Shah at 9:25 p.m. to report Alex's vital signs, restlessness, and the blood she had seen in his cell. (*Id.*). She also told Dr. Shah that Alex had said, "I need to go to the hospital," although under the circumstances she still "wasn't sure that he would be going to the hospital." (Def. Ex. I (Doc. 141-9, p. 115)). After receiving Nurse Ward's report, Dr. Shah decided to place Alex in the infirmary and ordered an IV. (Pl. SOF ¶ 124). Nurse Thurman was surprised by Dr. Shah's decision to place Alex in the infirmary because of how restless he was. (*Id.* ¶ 125).

Nurse Thurman found Alex to be "very clammy and restless," although he was still able to say: "Help me. Need an ambulance." (Def. SOF ¶ 30). She eventually got an IV into Alex's arm, but it did not stay in place because Alex was too restless. (*Id.*). Shortly thereafter, Alex "fell backward onto the cot and began agonal breathing and white foam came from his mouth." (*Id.*). Alex had no femoral pulse, so various staff members began CPR. (*Id.*). At this point, Alex began spitting up blood. (*Id.*). As he was coding, Nurse Ward called Dr. Shah again around 9:30 p.m., at which point he ordered Alex to be taken

---

[1] It is unclear whether the first aid room refers to the same place as the infirmary.

to the emergency room. (*Id.* ¶ 29). At approximately 9:35 a.m., a medical emergency was called for Alex, and Nurse Ward instructed the shift commander to call an ambulance. (Pl. SOF ¶ 131). Alex became unresponsive at 9:39 p.m. (*Id.* ¶ 132). Paramedics arrived at 9:50 p.m. and took over CPR. (*Id.* ¶ 135). Alex was pronounced dead at the hospital at 10:37 p.m. (Def. SOF ¶ 31).

The following day, Nurse Thurman resigned from her position at Wexford. (Pl. SOF ¶ 139). Nurse Ward, for her part, asked Nurse Lackey to review her notes regarding Alex's death several weeks alter because it was "weighing heavily on her mind." (*Id.* ¶ 140). And Dr. Shah agreed that Alex's outcome might have been different "if I would have sent him that morning." (*Id.* ¶ 145).

3.  Wexford's Hospital Transfer Policies

According to Hernandez, infirmary placements were encouraged in lieu of hospital stays because Wexford's contract with the State of Illinois called for payment "adjustments" in the event of hospital "overutilization." (Pl. Resp. ¶ 18; Pl. Ex. 4 (Doc. 148-3, p. 39)). In 2020, the "annual hospital utilization threshold" was approximately $7.5 million, and Wexford's total compensation was subject to a reduction by any amount of hospital costs that exceeded that threshold. (*Id.*; Pl. SOF ¶¶ 1, 2). For Dr. Shah, this meant that Wexford evaluated his performance in part based on his ability to "control expenses, conserve supplies, and operate within budget." (*Id.* ¶ 11; Pl. Ex. 5 (Doc. 150, p. 2)).

It is unclear whether nurses needed a doctor's approval to transfer a patient to the hospital in an emergency. Nurse Lackey testified that when a patient's life was in danger,

nurses were still instructed to obtain a doctor's approval before sending him to the hospital, although they were not prohibited from calling an ambulance "if [they] can't get ahold of the doctor." (*Id.* ¶ 4). Nurse Seed testified that she would rather send a patient to the hospital to be safe and "ask for forgiveness later." (Def. Ex. E (Doc. 141-5, p. 54)). Wexford's emergency services policy, for its part, provides a categorical directive that "in a life-threatening emergency, the patient will be sent to the hospital in the most expedient manner, and the physician will be notified later." (Pl. Ex. 11 (Doc. 154, p. 1)).

    4.   The Cause of Alex's Death

Dr. Shah testified that Alex's cause of death was "bleeding from his esophageal varices." (Pl. Ex. 8 (Doc. 148-5, p. 23)). Hernandez's gastroenterology expert, Dr. Lichtenstein, testified that Alex died from exsanguination (bleeding out). (Pl. Resp. ¶ 32). Dr. Lichtenstein also testified that the point at which Alex was no longer able to survive the bleeding on August 9, 2020, was "very late in the clinical course at the point when he was taken back to the infirmary and they couldn't get an IV in." (Def. Ex. A (Doc. 141-1, p. 41)).

The parties agree that bright red blood from the rectum is generally associated with self-limiting bleeding in the lower GI tract. (Def. SOF ¶ 4). It is also undisputed that hemorrhoids can cause bright red rectal bleeding and that lower GI bleeding generally is not fatal. (*Id.* ¶¶ 5, 6). But Nurse Thurman testified that an *upper* GI bleed can also come out red in color when it happens in the form of a "massive let go" and the blood is not digested before exiting the body. (Def. Ex. G (Doc. 141-7, p. 132-33)). When this happens, Nurse Thurman acknowledged that it can be fatal. (*Id.*, p. 133).

Dr. Lichtenstein also testified that a variceal bleed triggers a 60% likelihood of further bleeding within one year of the event. (Pl. SOF ¶ 19). Alex's history of hepatitis C and cirrhosis, moreover, placed him at an increased risk of GI and esophageal ulcers and varices. (*Id.* ¶¶ 20, 21). Dr. Shah thus admitted that Alex's health history "would cause a physician to be on higher alert for bleeding from esophageal varices." (*Id.* ¶ 21; Defendants' Response to Plaintiff's SOF ("Def. Resp.") ¶ 21 (Doc. 158-1)).

## LEGAL STANDARD

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Assertions that a fact cannot be or is genuinely disputed must be supported by materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials. FED. R. CIV. P. 56(c)(1). Once the moving party sets forth the basis for summary judgment, the burden shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (citation modified). This also means that the Court must "resolv[e] conflicts in the evidence in [the nonmovant's] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014). "The court has one task and one task only:

to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

## DISCUSSION

1. Deliberate Indifference

The Eighth Amendment's protection against cruel and unusual punishment "includes a right to adequate medical care." *Berry*, 604 F.3d at 439. This right "safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Hernandez avers that the Individual Defendants violated Alex's Eighth Amendment right when they failed to properly treat his rectal bleeding and related symptoms. To succeed on this theory, she must show that (1) Alex was suffering from an objectively serious medical condition and that (2) the Individual Defendants were deliberately indifferent to it. *Berry*, 604 F.3d at 440.

The Individual Defendants, for good reason, do not contest the objective seriousness of Alex's condition. "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Alex suffered from a history of esophageal varices and ulcers, endured several bleeding episodes from his rectum, complained of nausea, lightheadedness, stomach pain, and shortness of breath, underwent testing that suggested substantial blood loss, and ultimately bled to death. This was an objectively serious medical condition under the Eighth Amendment.

*See Goodloe v. Sood*, 947 F.3d 1026, 1027 (7th Cir. 2020) (rectal bleeding objectively serious);

*Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (same for

lymphoma); *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) (Achilles tendon

rupture); *Dixon v. Cnty. of Cook*, 819 F.3d 343 (7th Cir. 2016) (metastatic lung cancer); *Perez

v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (severe hand injury); *Pyles*, 771 F.3d at 411

(back pain); *Berry*, 604 F.3d at 440 (tooth decay and pain); *Greeno v. Daley*, 414 F.3d 645, 653

(7th Cir. 2005) (esophageal ulcer).

The critical question, then, is whether the Individual Defendants were deliberately

indifferent to Alex's medical condition. "Deliberate indifference occurs when a defendant

realizes that a substantial risk of serious harm to the prisoner exists, but the defendant

disregards that risk." *Berry*, 604 F.3d at 440. "[A] plaintiff does not need to show that the

official intended harm or believed that harm would occur." *Petties*, 836 F.3d at 728. Rather,

he must provide evidence that the defendant "*actually* knew of and disregarded a

substantial risk of harm." *Id.* (emphasis in original). Deliberate indifference involves a

higher degree of culpability than medical malpractice because a "mistake in professional

judgment cannot be deliberate indifference." *Whiting*, 839 F.3d at 662; *Pyles*, 771 F.3d at 409.

But "where evidence exists that the defendant knew better than to make the medical

decision that he did," deliberate indifference may be established. *Id.* (citation modified).

An inherent difficulty in many deliberate indifference cases is that defendants

rarely cop to the fact that they intentionally or recklessly disregarded a risk to the

patient's health. *Petties*, 836 F.3d at 728. Plaintiffs are therefore often forced to rely on

circumstantial evidence of the defendant's state of mind to prove deliberate indifference.

*Id.* To accommodate this evidentiary need, courts recognize that "the context surrounding a doctor's treatment decision can sometimes override his claimed ignorance of the risks stemming from that decision." *Id.* at 731. And "[w]hen a doctor says he did not realize his treatment decisions (or lack thereof) could cause serious harm to a plaintiff, a jury is entitled to weigh that explanation against certain clues that the doctor *did* know." *Id.* (emphasis in original).

With these principles in mind, the Court will examine the Individual Defendant's liability separately because they each played different roles in Alex's treatment.

### a.   Dr. Vipin Shah

Dr. Shah's treatment of Alex shows a pattern of choosing easier and potentially less efficacious interventions even though he knew Alex was suffering from esophageal varices and losing blood. Dr. Shah saw Alex on July 28, 2020, when he complained of chest pain and trouble breathing. Although he suspected a heart issue, he reviewed Alex's medical chart twice in connection with these complaints, where he learned of Alex's history of esophageal varices. He also knew that Alex had been hospitalized twice over the past year due to esophageal varices. Dr. Shah thus admitted that Alex's history required any doctor who was treating him to be on "higher alert."

But if that was Dr. Shah's understanding of the seriousness of Alex's condition, his actions suggested anything but. Less than two weeks after he saw Alex for his chest pain, Alex was back in the infirmary because he was again experiencing rectal bleeding. When Dr. Shah spoke with Nurse Seed about Alex's condition, he was concerned that Alex might be suffering from "a condition more serious than hemorrhoids." Dr. Shah directed

Alex to be placed in the infirmary and ordered a CBC test. When that test revealed that Alex's hemoglobin level had dropped below the level he had registered during his June 2020 hospitalization, Dr. Shah did not adjust his treatment recommendation. He kept Alex in the infirmary for one night and discharged him before lunch the following day. A jury could find, based on this evidence, that Dr. Shah simply chose the path of least resistance when Alex's rectal bleeding returned, even though he was aware of the seriousness of his condition. *Compare Pyles*, 771 F.3d at 412 (no deliberate indifference where "there was no prior indication of a potentially serious long-term medical issue.").

Dr. Shah's refusal to immediately send Alex to the hospital after Nurse Ward called him at 9:25 p.m. on August 9 also suggests his culpability. "Prison officials must provide inmates with medical care that is adequate in light of the severity of the condition and professional norms." *Perez*, 792 F.3d at 777. By the time Nurse Ward called Dr. Shah, Alex's condition was as critical as it could get. He was losing blood and pleading with nurses to let him go to the hospital. Dr. Shah, however, directed Nurse Ward to place Alex back in the infirmary. Not until Nurse Ward called Dr. Shah a second time, when Alex had no femoral pulse, was coding, breathing in agony, and foaming from the mouth, did Dr. Shah approve a hospital transfer. Dr. Shah's knowledge of the Code 3 emergency in Alex's cell, his known concerns about Alex's history of esophageal varices, and his suspicion that Alex was suffering from "a condition more serious than hemorrhoids" *before* the night of August 9 suggests that he might have known better than to just leave Alex in the infirmary. *See id.* at 777-78 ("A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain.").

Finally, the record suggests that Wexford was financially incentivized to reduce hospital transfers. Its contract with the State of Illinois called for payment reductions in the event of hospital "overutilization." Dr. Shah's performance was evaluated in part based on his ability to "control expenses, conserve supplies, and operate within budget." Dr. Shah insists that this evidence is irrelevant to his culpability under the Eighth Amendment because it concerns Wexford's institutional fault, not his own. But if Wexford required or encouraged Dr. Shah to limit hospital transfers, which his performance evaluation suggests it might have, such evidence permits an inference that Dr. Shah's treatment decisions were not entirely based on his medical judgment.

To be clear, whether Dr. Shah was in fact motivated by Wexford's financial interests is a question for the jury. For now, it is enough to recognize that Wexford's financial incentives could have affected Dr. Shah's treatment of Alex. This, in turn, can support Dr. Shah's culpability because it suggests that he delayed a hospital transfer for non-medical reasons. *See Petties*, 836 F.3d at 733 (evidence that treatment decision was based on cost concerns rather than medical judgment supports deliberate indifference); *Perez*, 792 F.3d at 777 ("delay[ing] a prisoner's treatment for non-medical reasons" can support deliberate indifference); *accord Seats v. Shah*, No. 21-cv-1049, 2024 WL 4252648, at *3 (S.D. Ill. Sept. 20, 2024).

Accordingly, summary judgment is denied as to Count I.

### b. Nurse Pamela Ward

Nurse Ward's treatment of Alex reveals a lack of urgency in the face of obvious medical distress. When she was called to Alex's cell on August 9 for a Code 3 emergency,

the cell was covered in blood. She saw "blood in the toilet" and "dried blood on [Alex]."

A few minutes later, she was unable to give Alex an IV because he was too restless, and

told her: "I need to go to the hospital." These are unmistakable signs of human suffering.

It was incumbent upon Nurse Ward to respond with appropriate dispatch. *See Farmer v.*

*Brennan*, 511 U.S. 825, 842 (1994) ("[A] factfinder may conclude that a prison official knew

of a substantial risk from the very fact that the risk was obvious.").

Nurse Ward had also witnessed the deterioration of Alex's condition on August 9

firsthand. She saw Alex four hours before his death when he asked to see a doctor and

she gave him e-pass to see Dr. Shah the following day. So, when she saw Alex's cell

covered in blood later that evening, Nurse Ward could have ordered a hospital transfer

without Dr. Shah's approval under Wexford's emergency services policy. Instead, she

spoke with Dr. Shah *twice* before directing the shift commander to call an ambulance at

9:35 p.m., 20 minutes after the Code 3 emergency call. Her decision to wait that long may

have contributed to Alex's death because, according to Dr. Lichtenstein, the point at

which Alex was no longer able to survive the bleeding was "very late in the clinical course

at the point when he was taken back to the infirmary and they couldn't get an IV in."

The Court acknowledges that things were moving quickly and that Nurse Ward

was forced to make decisions without much time for contemplation. But her decision not

to call for emergency help after seeing Alex covered in blood and hearing his pleas to be

taken to a hospital is, at a minimum, consistent with deliberate indifference. "[E]ven brief,

unexplained delays in treatment may constitute deliberate indifference" when the

consequences of inaction are severe and obvious. *Perez*, 792 F.3d at 778. Nurse Ward's

refusal to call an ambulance in light of Alex's rapidly deteriorating condition, therefore, supports Hernandez's claim of deliberate indifference against her. *See Petties*, 836 F.3d at 729 ("If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it."); *Whiting*, 839 F.3d at 663 ("State-of-mind evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment.").

Nurse Ward also cannot escape liability by pointing to Dr. Shah's supervisory treatment authority. "Although a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient." *Berry*, 604 F.3d at 443. Nurse Ward thus had an "independent duty" to respond to Alex's fight for his life in a constitutionally adequate manner. *Perez*, 792 F.3d at 779. Whether she did so will be up to a jury to decide.

Accordingly, summary judgment is denied as to Count V.

### c. *Nurse Amy Thurman*

Nurse Thurman saw that Alex had suffered a rectal bleed twice on August 8 alone. When he saw her that afternoon, he told her that his rectal bleeding may be due to "varices or [an] ulcer." Nurse Thurman, however, suspected that Alex may be suffering a GI bleed or internal hemorrhoids. Alex, clearly frustrated by Nurse Thurman's apparent disregard of his reported varices, told Hernandez that afternoon: "I'm losing a lot of blood. I'm sh****ng like a lot of blood . . . I told the woman, she said when the blood comes out like that it's a, it's hemorrhoids. I told her been having this s**t for like twenty years.

Page 18 of 28

I told her, I know, I know what it is, I got some [varices] bust."[2] Nurse Thurman's diagnosis of possible hemorrhoids is troubling because she knew about Alex's history of esophageal varices, and Nurse Seed had documented that her examination earlier that day revealed *no* visual hemorrhoids. This finding is consistent with Alex's medical records from March 4, 2020, where he denied a history of hemorrhoids during treatment for an earlier episode of blood in his stool. The record thus presents a triable issue as to whether Nurse Thurman ignored Alex's complaints of varices and the risks that came with that condition.

The Individual Defendants contend that Nurse Thurman exercised her professional judgment in treating Alex because she never *observed* him experiencing lightheadedness, nausea, shortness of breath, or other symptoms. Thus, so their argument appears to go, Alex's report of these symptoms to Nurse Seed the morning of August 8 was no longer relevant to Nurse Thurman's treatment of him. The first problem

---

[2] The Individual Defendants argue that Alex's August 8 phone call with Hernandez constitutes inadmissible hearsay. Hernandez responds that the call is admissible as a present sense impression under Federal Rule of Evidence 803(1) or as an excited utterance under Rule 803(2). The Court agrees with Hernandez that this statement, at a minimum, qualifies as a present sense impression. Under this exception to the hearsay rule, "'(1) the statement must describe an event or condition without calculated narration; (2) the speaker must have personally perceived the event or condition described; and (3) the statement must have been made while the speaker was perceiving the event or condition, or immediately thereafter.'" *United States v. Boyce*, 742 F.3d 792, 797 (7th Cir. 2014) (quoting *United States v. Ruiz*, 249 F.3d 643, 646 (7th Cir. 2001)). Alex's descriptions of his conditions, including that he was "losing a lot of blood," was "sh****ng like a lot of blood," and that he told Nurse Thurman he was suffering from varices and not hemorrhoids qualify as present sense impressions. His description of his own physical conditions concern matters he personally perceived. The record also demonstrates that the phone call was placed very soon after he met with Nurse Thurman because Nurse Thurman spoke with Alex at 4:20 p.m., and Alex called Hernandez at 4:30 p.m. This satisfies the contemporaneity requirement of Rule 803(1). *See id.* (present sense impression exception not undermined where declarant went to neighbor's house before calling police).

The Court reserves ruling on the question of whether the call is admissible in gross. For now, it is enough to recognize that certain portions of it, including Alex's contemporaneous descriptions of his condition are admissible under Rule 803(1).

with this argument is that a patient's lightheadedness is not always a visible symptom. It is thus unclear how Nurse Thurman expected Alex to reveal it other than by reporting it. But beyond that, "there is no requirement that a prisoner provide 'objective' evidence of his pain and suffering—self-reporting is often the only indicator a [provider] has of a patient's condition." *Greeno*, 414 F.3d at 655; *see also Goodloe*, 947 F.3d at 1027 (7th Cir. 2020) ("Patients are often the best source of information about their medical condition.").

A jury could find also that Nurse Thurman recklessly disregarded these symptoms. Alex had reported lightheadedness, stomach pain, nausea, and shortness of breath to Nurse Seed a few hours before seeing Nurse Thurman on August 8. Alex also told Hernandez ten minutes after he saw Nurse Thurman that he was experiencing chest pain, shortness of breath, weakness, cold sweats, and was losing blood. The record therefore demonstrates that Alex was experiencing a host of concerning symptoms throughout the day on August 8, even though Nurse Thurman recorded none of them.

If Nurse Thurman recklessly disregarded Alex's non-visible symptoms—which she, of course, may or may not have done—then her personal observations of his condition further demonstrates her deliberate indifference. When she noticed "some red to toilet" after viewing Alex's stool, she suspected he may be suffering a GI bleed or internal hemorrhoids. She knew that a patient who is suffering a GI bleed may need to be "sent out" if he is also complaining about lightheadedness. Thus, her reliance on the lack of objective evidence of lightheadedness does not absolve her of the duty to connect the dots. And because Alex's report of lightheadedness was documented and his CBC

test showed unusually low hemoglobin levels, which Nurse Thurman recognized as a sign of internal bleeding, she cannot rely on the absence of objective indicia of lightheadedness to claim she was unaware of the seriousness of his condition.

The evidence also suggests that Nurse Thurman failed to provide constitutionally adequate care when she observed Alex in acute distress in the first aid room on the night of August 9. Nurse Thurman admits she was surprised by Dr. Shah's decision to place Alex in the infirmary as opposed to sending him to the hospital because of how restless Alex was. And why wouldn't she be? When she saw Alex in the first aid room, she found him to be "very clammy and restless" and heard him plead: "Help me. Need an ambulance."

A jury may conclude from this admission that Nurse Thurman knew Alex needed to go to the hospital immediately but that she deferred to Dr. Shah in defiance of her own professional judgment. Viewing the evidence in Hernandez's favor, as the Court must, Nurse Thurman cannot hide behind Dr. Shah's treatment decisions when she knew Alex needed emergency care. *See id.* at 1031 ("[W]hen a doctor is aware of the need to undertake a specific task and fails to do so, the case for deliberate indifference is particularly strong."). Her failure to exercise professional judgment under the circumstances was particularly apparent because Dr. Shah was not on site to witness the harrowing events that she saw firsthand. The evidence thus supports an inference that Nurse Thurman exercised "blind or unthinking" deference to Dr. Shah against her better judgment. This conclusion is also supported by Nurse Thurman's decision to resign from Wexford *the next day*. Whatever her reason for doing so, a jury may consider its temporal

proximity to Alex's death as evidence that she knew better than to act the way she did.

*See Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 683 (7th Cir. 2012) ("[A] a nurse may

not unthinkingly defer to physicians and ignore obvious risks to an inmate's health."),

*abrogation on other grounds recognized by Whitaker v. Dempsey*, 144 F.4th 908, 924 (7th

Cir. 2025); *Perez*, 792 F.3d at 779 ("Nurses, like physicians, may . . . be held liable for

deliberate indifference where they knowingly disregard a risk to an inmate's health.").

Accordingly, summary judgment is denied with respect to Count IV.

### d.   Nurse Amy Frey

The record also permits a reasonable inference that Nurse Frey was deliberately

indifferent to Alex's medical needs. When she took over Alex's care at 7:30 a.m. on

August 8, Nurse Frey found that Alex's lungs were clear, his skin dry, and that his

heartrate was normal. But Hernandez argues that Alex's condition could not have

improved so dramatically in the hour plus since Nurse Seed had examined him because

his bloodwork from the CBC test revealed hemoglobin and hematocrit levels below the

levels of his hospitalization on June 3, 2020. Alex also told Hernandez later that day that

he had been "sweating and sweating," was feeling "very cold, [and] very weak," and that

that he was unable to walk or breathe normally. Moreover, Hernandez cites Alex's

autopsy, which found two liters of blood in his GI tract, to argue that Nurse Frey's

documentation of Alex's condition could not have been accurate.

Viewing the evidence in Hernandez's favor, a jury could conclude that Nurse Frey

either ignored Alex's symptoms or that she deliberately failed to record them in her

treatment notes. Alex had reported lightheadedness and stomach pain throughout the

early morning hours of August 8. Nurse Seed then recorded these symptoms and ran a CBC test which showed that he was losing blood. Nurse Frey received Nurse Seed's report indicating Alex's struggles but then found that Alex dramatically improved within a little over an hour.

A jury may believe this rapid turnaround, or they may not. Indeed, considering Alex's report of sweating and feeling cold and the accumulation of two liters of blood in his GI tract less than two days later, a jury may find Nurse Frey's description of Alex's condition not credible. And if a jury draws that conclusion, they very well may also find deliberate indifference based on Nurse Frey's disregard for Alex's alarming symptoms. *See Saddy v. Agnesian Health Care*, No. 13–CV–519, 2017 WL 570787, at *5 (E.D. Wis. Feb. 13, 2017) (falsification of treatment note supported deliberate indifference claim).

Accordingly, summary judgment is denied as to Count III.

### e.  Nurse Deena Seed

The record tells a different story with respect to Nurse Seed. She only saw Alex once at 6:05 a.m. on August 8 when he reported blood in his stool. Her interaction with Alex lasted a little more than one hour because she transferred his care to Nurse Frey at 7:30 a.m. During this time, Nurse Seed documented Alex's symptoms, including lightheadedness, stomach pain, nausea, and shortness of breath. She reviewed Alex's chart and saw that he had been hospitalized with a GI ulcer, which she understood to be a "serious medical issue" that can cause fatal internal bleeding if not treated properly. She reported her observations to Dr. Shah and ran a CBC test as he instructed.

There is no indication that Nurse Seed intentionally or recklessly disregarded a

risk to Alex's health. Although Alex was "argumentative" with her, the evidence does not support a finding that he needed care that Nurse Seed refused to provide. Rather, Nurse Seed considered the seriousness of Alex's condition, including his history of hepatitis C, cirrhosis, and a prior hospitalization for a GI ulcer. She discussed Alex's treatment with Dr. Shah and followed his instructions to test his blood and to keep him in the infirmary for observation. Considering the lack of *obvious* medical distress, Nurse Seed's handling of the situation does not raise the specter of a radical departure from basic standards of care. *See Petties*, 836 F.3d at 728 (deliberate indifference requires evidence of "blatant disregard [of] medical standards").

Hernandez argues that Nurse Seed should have transferred Alex to the hospital right away when he reported blood in his stool because it suggested that he was bleeding internally. That certainly would have been prudent in hindsight, but mistakes in medical judgment do not equate to deliberate indifference. And when considering Nurse Seed's conduct alongside Nurses Ward and Thurman's, who failed to call an ambulance for 20 minutes while Alex was dying in front of their eyes, it becomes apparent that Nurse Seed's culpability is not comparable. "To infer deliberate indifference on the basis of a [provider's] treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). Nurse Seed's conduct does not meet this standard. Rather, her treatment of Alex demonstrates that she took his complaints seriously, reported her findings to Dr. Shah, followed his treatment instructions, and exercised her professional judgment.

Accordingly, Nurse Seed is entitled to summary judgment as to Count II.

2. <u>Medical Malpractice</u>

The Individual Defendants also seek summary judgment on Counts VII through XVI based on medical malpractice. They argue that Hernandez is unable to demonstrate that they proximately caused Alex's death. This argument, as the Court understands it, advances two independent theories. First, the Individual Defendants argue that were not responsible for Alex's death because doctors at Carle Hospital failed to properly treat him in June 2020, and that those failures—as opposed to their own—caused Alex's death. Second, the Individual Defendant argue that Alex's death was not a foreseeable consequence of his symptoms. The Court will consider each argument in turn.[3]

Proximate cause consists of cause in fact and legal cause. *Morisch v. United States*, 653 F.3d 522, 531 (7th Cir. 2011). Cause in fact turns on the question of "whether the injury would have occurred absent the defendant's conduct." *City of Chicago v Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1127 (Ill. 2004). Legal cause, on the other hand, is about foreseeability—*i.e.*, "whether the injury is of a type that a reasonable person would see as a likely result of his conduct." *Id.* "Proximate causation is typically a question for the jury." *Hakim v. Safariland, LLC*, 79 F.4th 861, 872 (7th Cir. 2023).

---

[3] Hernandez's Eighth Amendment claims, as noted, demand a higher level of culpability than her medical malpractice claims. The Court's denial of all but one of these claims therefore could be enough to preclude summary judgment on the medical malpractice claims against Dr. Shah, and Nurses Ward, Thurman, and Frey. *See McDonald v. Obaisi*, No. 16 C 5417, 2021 WL 3910754, at *10 (N.D. Ill. Sept. 1, 2021) ("because the standard for deliberate indifference is higher than that under state law for medical malpractice, the Court's conclusion that issues of fact preclude summary judgment on the deliberate indifference claim similarly carries over to the medical malpractice claim.") (internal citation omitted); *Flournoy v. Estate of Obaisi*, No. 17 CV 7994, 2020 WL 5593284, at *15 (N.D. Ill. Sept. 18, 2020); *cf. Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 461-62 (7th Cir. 2020). The Court will nevertheless consider the Individual Defendants' causation arguments within the framework of Hernandez's medical malpractice claims.

The Individual Defendants point to Dr. Lichtenstein's testimony that physicians at Carle Hospital failed to perform a prophylactic band ligation on Alex in June 2020, and that if they had done so, it likely would have saved his life. This argument seeks to attribute the full causal sequence that led to Alex's death to the providers at Carle Hospital.

But the Individual Defendants are wrong to cut off the causal chain of events more than two months before Alex's death. Their argument fails to appreciate the commonsense proposition that "an injury may have multiple proximate causes." *Id.* The fact that a ligation procedure could have saved Alex's life does not mean that the Individual Defendants could *not* have prevented his death by treating his symptoms with appropriate urgency. Dr. Shah himself admits as much. He testified that Alex's outcome might have been different "if I would have sent him that morning."

Hernandez also is not required to show that "but for" the Individual Defendants' conduct, Alex "would definitely have lived." *Miranda v. Cnty. of Lake*, 900 F.3d 335, 347 (7th Cir. 2018). It is enough for her to show that they "diminished [his] chance of survival" by not having him transferred to the hospital earlier. *Id.* Hernandez satisfies this burden through Dr. Lichtenstein's testimony that Alex's point of no return (*i.e.*, the moment at which no medical intervention would have saved him), was "very late in the clinical course at the point when he was taken back to the infirmary and they couldn't get an IV in." This testimony, disputed as it may be, supports the causal connection between the Individual Defendants' conduct and Alex's death because it attributes his diminished chance of survival to their delay in calling an ambulance. And in doing so, it provides the

necessary causal link to support Hernandez's medical malpractice claims. *See Jackson v. Sheriff of Winnebago Cnty.*, 74 F.4th 496, 501 (7th Cir. 2023) (summary judgment is "rare[ly]" appropriate in cases alleging delayed medical care) (quotation omitted).

The Individual Defendants also argue that Alex's death was not a foreseeable consequence of his conditions. This argument, as the Court understands it, relies on Plaintiff's experts' agreement that bright red bleeding from the rectum is generally associated with self-limiting bleeding in the lower GI tract. And if Alex's symptoms were consistent with non-emergent bleeding, the Individual Defendants argue, then his death was not a foreseeable consequence of their failure to have him hospitalized.[4]

Foreseeability is a classic jury question in the negligence context. *See Gracyalny v. Westinghouse Elec. Corp.*, 723 F.2d 1311, 1316 (7th Cir. 1983) ("In negligence cases, questions concerning the reasonableness of the parties' conduct, foreseeability and proximate cause particularly lend themselves to decision by a jury."). Here, the record contains ample evidence from which a jury may find that Alex's death was a reasonably foreseeable consequence of the Individual Defendants' conduct. All of the Individual Defendants recognized the possibility that Alex might be suffering from something more serious than a self-limiting bleed of the lower GI tract. Nurse Seed knew that Alex had been hospitalized for a GI ulcer and understood his condition to be a "serious medical issue" that can cause fatal internal bleeding if not treated properly. Nurse Frey admitted

---

[4] Late in their brief, the Individual Defendants appear to impugn Hernandez's experts' qualifications to opine on the cause of Alex's death. (Doc. 141, p. 36). This argument appears to suggest that Hernandez's evidence of causation is speculative and thus not competent to defeat their motion for summary judgment. The Court does not consider this argument as raising an admissibility challenge under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

that Alex's symptoms of lightheadedness, shortness of breath, weakness, stomach pain, and cold, clammy sweats could be a sign of a fatal GI bleed. Nurse Thurman testified that an *upper* GI bleed can also come out red in color when it happens in the form of a "massive let go" and the blood is not digested before it exits the body. And when this happens, Nurse Thurman agreed that it could be fatal. Dr. Shah, for his part, testified that any doctor treating Alex had to be on "higher alert." And Nurse Ward gave Alex an emergency pass to see Dr. Shah as soon as he was back at LCC even though inmates often had to wait several days to be seen by a doctor. It is therefore illogical to claim that Alex's death was not foreseeable, when the Individual Defendants themselves recognized that his medical history and combination of symptoms put him at risk of death. The Court therefore rejects the Individual Defendants' foreseeability argument.

Accordingly, summary judgment is denied as to Counts VII through XVI.

## CONCLUSION

For these reasons, the motion for summary judgment filed by Defendants Vipin Shah, Deena Seed, Amy Frey, Amy Thurman, and Pamela Ward (Doc. 138) is **GRANTED in part** and **DENIED in part**. Summary judgment is **GRANTED** as to Count II, and the Eighth Amendment claim against Nurse Deena Seed is **DISMISSED with prejudice**. All other claims against the Individual Defendants will proceed to trial.

**IT IS SO ORDERED.**

**DATED:  April 22, 2026**

**NANCY J. ROSENSTENGEL**
**United States District Judge**